greatplainsv.deptbanking2.13.15.txt

1

```
 1   No:  HHBCV15-6028096 S          :     SUPERIOR COURT

 2   GREAT PLAINS LENDING, LLC,     :     JUDICIAL DISTRICT
     Et al.                               OF NEW BRITAIN
 3

 4   v.                             :     AT NEW BRITAIN, CONNECTICUT

 5   STATE OF CONNECTICUT           :     February 4, 2015
     DEPARTMENT OF BANKING, et al   :
 6   _____ :

 7
     B E F O R E:  The Honorable Carl J. Schuman, Judge
 8

 9   A P P E A R A N C E S:

10        Representing the Plaintiffs:

11             Attorney Robert Rosette
               Rosette, LLP
12             565 W. Chandler Boulevard
               Suite 212
13             Chandler, AZ 85255

14        Also Present:  Attorney Saba Bazzazieh and Attorney
                          Attorney Anthony Jannotta
15

16        Representing the Defendant:

17             Attorney Robert J. Deichert
               Assistant Attorney General
18             P.O. Box 120
               55 Elm Street
19             Hartford, CT 06141-0120

20        Also Present:  Attorney John Langmaid, AAG

21

22                         Recorded By:
                           Donna L. Peluso
23
                           Transcribed By:
24                         Donna L. Peluso
                           Court Recording Monitor
25                         20 Franklin Square
                           New Britain, CT
26                         860-515-5380 Ext. 3080

27
```

greatplainsv.deptbanking2.13.15.txt

2

1    (In open court).

2        THE COURT:  Good afternoon.  Please be seated.  This is

3    the matter of Great Plains Lending, LLC v. The State Banking

4    Department.  Can I have the appearances of counsel,

5    beginning with plaintiffs' counsel.

6        ATTY. ROSETTE:  My name is Robert Rosette, specially

7    appearing on a limited basis on behalf of Great Plains

8    Lending, LLC Clear Creek Lending, which are 100 percent

9    owned and operated by the Otoe-Missouria Tribe, and also

10   specially appearing on a limited basis on behalf of the

11   Tribe's Tribal Chairman, John Shotton.

12       THE COURT:  All right.  Are you the arguing counsel?

13       ATTY. ROSETTE:  Yes.

14       THE COURT:  Okay.

15       ATTY. ROSETTE:  I should be handling potentially about

16   95 percent of the argument depending on what the questions

17   are.

18       THE COURT:  True.  All right.  I'm not sure that we

19   recognize special or limited appearances in this state, but

20   we won't address that issue now.  All right.  Can we move

21   along.  Go ahead, counsel.

22       ATTY. BAZZAZIEH:  Saba Bazzazieh, Your Honor, on behalf

23   of plaintiffs.

24       THE COURT:  All right.

25       ATTY. JANNOTTA:  Anthony Jannotta, Your Honor, from the

26   Denton's law firm, on behalf of plaintiffs as well.

27       THE COURT:  All right.  For the commissioner?

greatplainsv.deptbanking2.13.15.txt

3

```
1          ATTY. DEICHERT:  Assistant Attorney General Robert
2     Deichert.
3          THE COURT:  Okay.
4          ATTY. LANGMAID:  Assistant Attorney General John
5     Langmaid.
6          THE COURT:  All right.  Good afternoon, counsel.  I've
7     read the papers, and I'm familiar with the case and the
8     issues.
9          Let me just address a few preliminary matters so we can
10    get to the heart of the matter.  First, I'm inclined -- I am
11    prepared to consider the plaintiff's application for a
12    temporary injunction ex parte as a motion for stay.
13    Although, I would just advise the plaintiffs to become more
14    familiar with Connecticut procedure as we go forward, but
15    I'm not going to default plaintiff on that sort of technical
16    basis.
17         Similarly, I'm not going to consider the issues in the
18    defendant's motion to dismiss as relevant to the motion for
19    stay.  We can address the motion to dismiss at the
20    appropriate time, but those issues are also somewhat
21    technical and I don't feel they rise to the level of being
22    relevant to the motion for stay.  So we don't have to
23    address those today.
24         Third, I will tell you that I'm not going to order the
25    plaintiffs to pay into the Banking Department any monies by
26    February 6, so we don't have to address that sort of
27    time-sensitive issue, but I am interested in hearing from
```

greatplainsv.deptbanking2.13.15.txt

4

1    both sides either now or after court informally or by a
2    letter, or otherwise, what sort of insurances that the
3    plaintiffs could give and that the defendants would want to
4    assure that in the event that your appeals are unsuccessful
5    that you would be good to pay the, pay the order or pay any
6    judgment.  So you can address those either now or later.
7    And just, for example, what I had in mind was either an
8    escrow account or bond or something along those lines.
9          ATTY. ROSETTE:  Your Honor, and --
10         THE COURT:  And you do have to stand when addressing
11   the Court.
12         ATTY. ROSETTE:  I'm sorry.
13         THE COURT:  Yes, sir?
14         ATTY. ROSETTE:  Forgive me, Your Honor.
15         THE COURT:  All right.
16         ATTY. ROSETTE:  While, obviously, you've read our
17   briefs and --
18         THE COURT:  I have.
19         ATTY. ROSETTE:  -- and we're challenging this, the
20   jurisdiction of the Department of Banking, we, we believe
21   that paying those amounts in the form of escrow and a bond
22   would be acceptable.
23         THE COURT:  I see.  Okay.  I don't know whether that
24   was something that you came close to agreeing upon with the
25   defendants, but perhaps you can either talk to defense
26   counsel after the hearing or, and see if you can agree on
27   the form for doing that.  Or if you can't, then you can just
                              Page 4

greatplainsv.deptbanking2.13.15.txt

5

1    submit a letter to me with your best proposal, and I could

2    hear from the defendants best proposal and decide.  But it

3    sounds like you ought to be able to agree, or we ought to be

4    able to find a way that can protect both sides from the

5    financial consequences of losing.

6         So let's not belabor that issue, and we'll just really

7    focus on the cease and desist order and get to the merits,

8    which I have read a bit about.  So, Mr. Rosette, on that?

9         ATTY. ROSETTE:  Yes.  Thank you, Your Honor.  The

10   relief that we're seeking really has a, has a four-part

11   test, as you know, and if I could just address each of

12   those.

13        We really -- the tribe in this case, and it is the

14   Otoe-Missouria Tribe when, when bringing the action against

15   these two, two tribal business entities and the chairman,

16   has no adequate remedy at law.  First of all, there is a

17   harm to the government that cannot be fixed by a, any sort

18   of monetary relief that, that we could seek.  There is

19   direct harm to the tribe's sovereignty.  The tribe in this

20   case would be unable to fund extremely important government

21   programs.  These books are 100 percent taxed by the tribe.

22   Every penny of the revenues from these, these programs these

23   programs go to health-care dollars for elders, as you saw in

24   the affidavits, also language programs, other governmental

25   services by the tribe.  This is a sovereign nation, and it

26   does have these government programs.

27        THE COURT:  But isn't this essentially a commercial

Page 5

greatplainsv.deptbanking2.13.15.txt

6

⚀

```
1        activity by the tribe that perhaps shouldn't get the same

2        sort of protection as attempt by a state government to

3        interfere with things that go more to the essence of tribal

4        self-government, such as schools or courts or, or government

5        institutions?

6             ATTY. ROSETTE:  Well, these are, these are commercial

7        enterprises that are 100 percent owned by the tribal

8        government, and the attributes of sovereignty, this has been

9        held by the supreme court over and over again in Kiowa v.

10       Manufacturing Technologies, more recently in the Bay Mills

11       case, that the attributes of tribal sovereignty extend over

12       these tribal enterprises, specifically here these

13       enterprises have been structured and created in a manner in

14       which they are arms of the tribe.  So they are, are provided

15       with all of those tribal attributes including sovereign

16       immunity from suit.

17            And, again, the way that they've been structured is not

18       only are the, the businesses owned 100 percent by the tribe,

19       they're managed by the tribe.  And, most importantly, as I

20       stated, all of the revenues are directed to tribal

21       government programs.  They are taxed 100 percent by the

22       tribe.  That's essentially the only tax base that this tribe

23       has because of, of the rural location of the government and,

24       and their inability to seek various forms of economic

25       development.  So it's not uncommon that tribes pursue these

26       types of interests through commercial ventures owned by the

27       tribe to provide for their citizenry as a sovereign nation.
```

greatplainsv.deptbanking2.13.15.txt

1    The other adequate, inadequate remedy at law that we

2    have is with regard to the chairman himself.  The chairman

3    of the tribe is obligated to follow the law of the tribe, to

4    adhere to its constitution, and he would be unable to do so

5    in this instance, and, obviously, we don't have any, and

6    adequate remedy at law for that as well.

7    With regard to the second prong, whether or not the

8    tribe will suffer irreparable harm without an injunction

9    really allowing the department to proceed with enforcement

10    of an order results in an unprecedented finding that a state

11    administrative body can abrogate the sovereign immunity of

12    an indian tribe.

13    THE COURT:  But why didn't you cite the second circuit

14    decision in Otoe-Missouria Tribe v. Financial Department of

15    New York in your brief?

16    ATTY. ROSETTE:  Because, Your Honor, this is a classic

17    case of whether or not the tribe waived its sovereign

18    immunity from suit, and there's only two ways in which a

19    tribe can waive its sovereign immunity from suit.  It can

20    consent to waive that immunity unequivocally and expressly

21    and grant a court, a state court jurisdiction or congress

22    can abrogate that immunity.

23    New York, the second circuit case is completely

24    distinguishable, and that case, the tribe, and it was this

25    tribe, which is no coincidence, brought that case.  It was

26    an affirmative action and met that first prong.  They

27    consented to that court's jurisdiction unequivocally and

greatplainsv.deptbanking2.13.15.txt

1    specifically and brought that affirmative action against the

2    state of New York.  That is not want is occurring here at

3    all.

4    　　　THE COURT:  But you said this is an unprecedented state

5    action, but it appears the state of New York did the same

6    thing.

7    　　　ATTY. ROSETTE:  The, the state --

8    　　　THE COURT:  One counsel at a time, please.

9    　　　ATTY. ROSETTE:  The, the state of New York they -- my

10   understanding is they did not do the same thing.  That the

11   state of New York has not taken any actions to find a

12   sovereign government.  They haven't issued any fines to the

13   Otoe-Missouria Tribe, and they haven't attempted to enforce

14   any fines against the Otoe-Missouria Tribe.  What the state

15   of New York was doing was impacting the tribe's ability to

16   engage in their lending operations by making very direct

17   threats to the banks that the Otoe-Missouria Tribe was

18   dealing with.  And the Otoe-Missouria Tribe had

19   affirmatively brought action against the state of New York

20   in a New York court waiving -- obviously, because they're

21   bringing the action -- they are consenting to that court's

22   jurisdiction.

23   　　　This action here would be unprecedented whereby a state

24   agency attempted to abrogate the sovereignty of the tribe

25   and abrogate the sovereign immunity of the tribe without

26   either of the very two clear principles that need to be

27   demonstrated.  And, again, that's either consenting to that,

Page 8

greatplainsv.deptbanking2.13.15.txt

1     to the jurisdiction of the state or pointing to

2     congressional abrogation of that sovereign immunity.  And I

3     would add, Your Honor, that there is none of those arguments

4     posed in any of the papers filed by the state.  They don't

5     make any of those points, they don't cite to any of those

6     cases, and, as I just pointed out to you, the second circuit

7     case in New York completely misses the mark with regard to

8     the issues that before you here today.

9         THE COURT:  Well, I follow what you're saying.  I think

10    that it's at least superficially close enough that it's

11    something that you should have cited.  You're faulting the

12    defendants for not citing things, but this case is a similar

13    situation.  I see the differences now, but I think it would

14    have been helpful to cite it rather than avoid it.

15        ATTY. ROSETTE:  Your Honor, may my colleague make a

16    point?

17        THE COURT:  Well, divided argument is --

18        ATTY. ROSETTE:  Oh, okay.

19        THE COURT:  -- not favored.

20        ATTY. ROSETTE:  That, that's fine, Your Honor, but --

21        THE COURT:  But we, we can move on.

22        ATTY. ROSETTE:  There, there are -- there are cases

23    that, that this court can look to that we did cite, whereby

24    state governments have attempted to bring actions against

25    tribally owned enterprises.  We cited those with regard to,

26    in California, the Miami Nation Enterprises case, whereby

27    the state of California attempted to bring an action, an

Page 9

greatplainsv.deptbanking2.13.15.txt

♀

1    enforcement action against --

2        THE MONITOR:  Okay.  Excuse me, Your Honor.

3        THE COURT:  Right.

4        THE MONITOR:  When your book laying on the button, it's

5    causes --

6        THE COURT:  Oh.

7        ATTY. ROSETTE:  Oh.  I'm sorry.

8        THE COURT:  Stay away from that.  Right.  Thanks.

9        ATTY. ROSETTE:  And then also in Colorado we cite to

10   the Cash Advance and Preferred Cash Loans case, and in both

11   of those cases, the states attempted to bring exactly the,

12   the same facts that we have here and attempted to bring

13   actions against those arms of the tribe, even though they

14   were business enterprises.  And in both of those cases, the,

15   the tribes sovereign immunity arguments have, have been

16   upheld consistent with the federal courts and supreme court

17   precedent that I have identified.

18       The state of New York case and the underlying basis for

19   it is just not applicable in this case because issues with

20   regard to whether or not the tribe waived its sovereign

21   immunity from suit were not at issue.  And all those

22   underlying facts are irrelevant to the court issues, legal

23   issue as to whether or not the tribe has waived its

24   sovereign immunity from suit.

25       All of this argument, Your Honor, goes to the third

26   prong obviously with regard to our --

27       THE COURT:  Likelihood --

Page 10

greatplainsv.deptbanking2.13.15.txt

1           ATTY. ROSETTE:  -- likelihood of success --

2           THE COURT:  Sure.

3           ATTY. ROSETTE: -- in moving this, in moving this case

4     forward.  The, the last --

5           THE COURT:  Why didn't you appear at the hearing?

6           ATTY. ROSETTE:  Well, Your Honor, we -- it's, it's

7     because we did file our -- we did make a special appearance.

8     We filed, what I believe very strong briefs with regard to

9     supreme court precedent, state court precedent, recognizing

10    the tribe's sovereign immunity from suit, and we felt that,

11    that we had put our best foot forward and expected the case

12    to be dismissed.  And, and, you know, that's --

13          Going to the, the fourth prong of the test was, with

14    regard to the balance of equities tipping in the tribe's

15    favor.  We just point out that the Connecticut law here in

16    this case does not apply, and the mere fact that Connecticut

17    has passed a statute restricting small-dollar lending does

18    not itself prove that there's a public interest served in

19    all cases if that statute can't be enforced or it's not

20    applicable to the Indian Tribe in this case.  And we've

21    cited a couple of cases, obviously, Your Honor, for you to

22    consider with regard to those points.

23          Secondly, there is public interest in favor of the

24    tribe that is really un-quantifiable in many respects, but

25    nonetheless, there is significant public interest in

26    promoting self-government.  You have a federally recognized

27    indian tribe here.  It, it -- that tribe does predate the

greatplainsv.deptbanking2.13.15.txt

1     state of Connecticut, that predates the United States

2     Constitution and there is strong interest in insuring that

3     it has the ability to protect the welfare of its citizenry

4     and to operate as a government.

5         With regard to the issues here, the tribe has a

6     commitment to protecting consumers.  They have best

7     practices in place.  They have a regulatory agency in place

8     with a strong commitment to regulate these loans, to insure

9     federal compliance of all laws, of all federal laws to

10    insure compliance with all tribal laws.  The citizens of the

11    state of Connecticut voluntarily, through electronic means,

12    seek these loans out from this government, agree to the

13    tribal court jurisdiction and agree to the provisions of

14    these loans.

15        THE COURT:  Don't we have a situation which the harm to

16    individual consumers, at least as defined by state law,

17    which is flagrantly violated here, is very concentrated.

18    Whereas, the harm to tribal government seems to be rather

19    defuse in that, as far as I know, you can engage in this

20    business in all the other states, and just, at least, for

21    the period of this appeal, can't do it in Connecticut?

22    Doesn't that harm pale in comparison to the harm to a

23    consumer who has to repay a loan at up to 400 percent

24    interest?

25        ATTY. ROSETTE:  Your Honor, to answer your question,

26    the, the -- the loan -- and I must tell you that the facts

27    of how these transactions occur are irrelevant with regard

Page 12

greatplainsv.deptbanking2.13.15.txt

```
 1      to the sovereign immunity argument.  So I'd just like to
 2      preface my comments with that.  But these loans are
 3      conducted and closed and the underwriting of the loans, et
 4      cetera, occur on the tribe's reservation pursuant to the
 5      tribe's laws.  The customers of these loans understand the
 6      terms of the loans.  They voluntarily enter those loans.
 7      They consent to the jurisdiction of the sovereign nation in
 8      this, to this extent.  And the bottom line is, is that the,
 9      the loans themselves are compliant with all applicable law,
10      both tribal and federal with regard to consumer protection.
11          The tribe has taken every step as a sovereign
12      government to insure that those laws are followed and that
13      consumers are protected.  You know, it's, it's almost no
14      different than a Connecticut resident that, that may take a
15      loan out in the state of Nevada while visiting Las Vegas in
16      contravention of Connecticut law in that case.
17          The third point that I wanted to make, though, is that
18      the department is not harmed in this case because by their,
19      their own admission, they can't do more itself to compel
20      plaintiffs' compliance with this order; so, therefore,
21      they're not necessarily harmed by having this stay in place
22      as well.
23          THE COURT:  You mean that let's say there were no
24      administrative appeal.  You're claiming that they, at least,
25      admit that they can't enforce the cease and desist order?
26          ATTY. ROSETTE:  Correct.  That's where the, obviously,
27      the attorney general's office would come in and --
```

greatplainsv.deptbanking2.13.15.txt

14

```
 1          THE COURT:  Well, they're in now --

 2          ATTY. ROSETTE:  -- at that point, we would have the --

 3     it's kind of a fait accompli because then we have the

 4     sovereign immunity arguments that obviously take precedent.

 5          THE COURT:  Uh-hum.  It doesn't appear that, although

 6     I'm not sure, but it doesn't appear that the customers or

 7     consumers who are taking these loans out are necessarily the

 8     most sophisticated in the world, and that's probably why we

 9     have these sort of usury laws.  And, although, I'm sure they

10     check, submitted or accept on their internet application,

11     it, it doesn't seem improper for the state to attempt to

12     protect these sort of consumers who may not understand that

13     they're consenting to tribal, to jurisdiction and all the

14     other things that you claim that they have knowingly and

15     voluntarily consented to.

16          ATTY. ROSETTE:  Your Honor, there's, there's nothing --

17     very respectfully, there's nothing in the record that would

18     suggest that.  In fact, there, there probably is strong

19     evidence that consumers who have the wherewithal to operate

20     a computer and engage in internet activity are, are -- are

21     sophisticated people.  I'm sure that there is probably the

22     ability for the tribe at some point to demonstrate that the,

23     the customers to an online-lending facility are readily

24     distinguishable from those in brick-and-mortar type

25     facilities.

26          But all of that just right now are not facts that are

27     before Your Honor.  What is before Your Honor is that, is
```

Page 14

greatplainsv.deptbanking2.13.15.txt

1       that there is strong public interest for the tribe having

2       its legitimate form of government, funding its government

3       programs.  The language programs for children.  The old

4       ladies that, that may need the dialysis machine in a health

5       clinic, and the fact that this is a governmental operation.

6       This is a sovereign nation that is not violating any

7       applicable laws.  As you read from our briefs, the state law

8       of Connecticut just does not apply not only to the tribe,

9       but not to these underlying loans.

10      And the Connecticut residents, what is in the facts, is

11      the Connecticut residents do consent to the jurisdiction of

12      the laws outside of the state of Connecticut where the loan

13      is being closed on the reservation.

14      THE COURT:  Doesn't the sovereign immunity argument get

15      weaker when these transactions occur off reservation?  They

16      incur in cyberspace somewhere.

17      ATTY. ROSETTE:  Your Honor, they, they do not because

18      the supreme court has held in, in the Kiowa case that

19      sovereign immunity not only applies to tribally owned

20      enterprises, but tribally owned enterprises that operate off

21      of the reservation.  And, again, if tribe's are not willing

22      to consent to waivers of that sovereign immunity from suit,

23      and, and if you read the Kiowa and the Bay Mills case, they

24      both focus on this point, then congress does have the

25      ability to abrogate that defense.

26      Congress, through its plenary power, can pass a law

27      that states that if tribes want to conduct business off of

greatplainsv.deptbanking2.13.15.txt

16

1      their reservation in other states, then they are waiving

2      their sovereign immunity from suit.  That is not the case

3      here.  It is not -- it's not the case.  Period.  The state

4      does not make that argument.  And, again, the Supreme Court

5      of the United States has been very clear that sovereign

6      would apply to the facts of this case.  Even though there's

7      an argument that it occurs in cyberspace.

8           THE COURT:  All right.  What else would you like to

9      add?  I understand the basics of your argument.  I'm going

10     to certainly give you a chance to respond after I've heard

11     from the defendants.

12          ATTY. ROSETTE:  Your Honor, I would just like to add

13     that we, that we do meet all four tests for the stay, and I

14     would just leave you with that it is not the tribes goal to

15     break laws, operate irresponsible businesses.  They have a

16     strong commitment to consumer protection.  They have very

17     strong codes and they, they have a commitment to consumer

18     protection.

19          THE COURT:  Well, what in this case show the tribe's

20     commitment to consumer protection?

21          ATTY. ROSETTE:  Mostly, we've been able to provide you

22     the form of affidavits from the chairman, and in his

23     carrying out of the tribal law to insure that those

24     protections exist.

25          THE COURT:  That's pretty vague.  Anything more

26     specific?

27          ATTY. ROSETTE:  Your Honor, we don't have anything more

greatplainsv.deptbanking2.13.15.txt

1    specific.  But, again, the, the issue is whether or not the

2    tribe has waived its sovereign immunity from suit in this

3    case.  So that's, that's all I have to say.

4        THE COURT:  Sure.  Thank you, sir.  Mr. Deichert?

5        ATTY. DEICHERT:  Thank you, Your Honor.  We, obviously,

6    disagree that the plaintiffs have met the four-factor test.

7        The public interest, as Your Honor recognized, I think

8    weighs very heavily in favor of denying a stay in this case.

9    The people involved with these loans are generally -- and

10   we're prepared to put testimony on, if Your Honor would like

11   to hear it, about types of borrowers that have these loans.

12       As far as the tribe's consumer protection, I think it's

13   enough to say that certainly I don't think they dispute that

14   -- whatever consumer protection they have in place allows

15   them to do loans of up to 400 percent interest, and that

16   obviously is directly inconsistent with Connecticut's

17   consumer protection.  And so these loans are uniquely

18   harmful in the sense that they tend to pray on lenders who

19   are, you know -- or borrowers who are unsophisticated, who

20   need money quickly, are willing to pay a very large interest

21   rate.  And, again, we're willing to put on testimony on that

22   if Your Honor would like to hear it.

23       As to -- that also goes to the prong about interest of

24   the third parties.  When you look at if the court were to

25   grant a stay in this case, that would allow Connecticut

26   consumers to presumably engage, you know, get loans during

27   the pendency of this appeal.  Those loans could have terms

Page 17

greatplainsv.deptbanking2.13.15.txt

1    that would go well outside, kind of the end of this

2    litigation.  And even during this litigation, even in a

3    one-year period or even less, consumers can result -- can

4    get into significant trouble.  If you look at the tribe's

5    website, for example, or the website for Great Plains

6    specifically, they have an example that they show a one

7    thousand dollar loan, basically the schedule requires that

8    the person taking that loan pay back over the -- and at the

9    end of the year pay back twenty-three hundred dollars in

10   interest on top of the one-thousand dollar loan.

11        So if you were to lift the stay in this case, that

12   would leave the tribe unfettered to get any number of

13   Connecticut consumers into that type of predicament.

14        THE COURT:  Isn't that one that they might knowingly

15   and voluntarily get into?

16        ATTY. DEICHERT:  That's -- You're correct, Your Honor.

17   I mean, and I guess, the judgment has been made by the

18   legislature that people should not be put in the position

19   where they're able to voluntarily agree to that because it's

20   illegal.

21        And now that gets to the point about applicable law.

22   My opposing counsel said that the second circuit's decision

23   in the Otoe case is irrelevant.  I respectfully disagree.  I

24   think it's highly relevant specifically to the issue of

25   applicable law.  What the second circuit had there is a

26   situation very similar to what you have here in the sense

27   that there the tribe was seeking preliminary injunctive

Page 18

greatplainsv.deptbanking2.13.15.txt

1       relief similar to a stay.  And the second circuit -- the

2       district court denied the stay based on a lack of likelihood

3       of success on the merits.  The second circuit affirmed that

4       decision and concluded that the tribes had not put on

5       sufficient factual evidence that the location of the

6       transaction was off reservation; and, therefore, under --

7       the district court properly denied the request.

8           Now, the second circuit offered the plaintiffs an

9       opportunity to develop facts on remand, and plaintiffs

10      chose, for whatever reason, to withdraw the case rather than

11      take that opportunity.  So for whatever means, that means

12      that the second circuit indicated that there's a good

13      argument that applicable law here is Connecticut law.

14          THE COURT:  I understood Mr. Rosette's argument to be

15      that in the New York matter, the state of New York went

16      after the third-party banks rather --

17          ATTY. DEICHERT:  That's --

18          THE COURT:  -- rather than the tribes.

19          ATTY. DEICHERT:  That, that is correct, Your Honor.  So

20      really the way I would conceptualize it is there's two

21      related issues.  One is, is Connecticut law applicable to

22      these transactions?  The second circuit looked at that

23      issue.  Concluded that the tribe had failed to establish a

24      likelihood of success on the merits of that issue.

25          Now in the second circuit case, that's the only issue.

26      As Attorney Rosette said, they had -- they had voluntarily

27      invoked the jurisdiction of the district court --

Page 19

greatplainsv.deptbanking2.13.15.txt

1          THE COURT:  That's true.

2          ATTY. DEICHERT: -- in order to get a court ruling.

3     That raises the question here.  They had voluntarily invoked

4     the jurisdiction of this court on this administrative

5     appeal.

6          Now they have certainly said throughout, and we admit,

7     they have said throughout that they are not -- they do not

8     intend to waive it.  They've said that.  I mean, and they

9     have done everything that's possible for them to say that

10    they're not intending to waive it.  The question becomes

11    are, are those statements of intent enough to avoid a

12    litigation -- waiver by litigation conduct.

13         Now, Your Honor, in the -- in kind of a somewhat

14    analogous situation of a Eleventh Amendment immunity for a

15    state, the Supreme Court's decision in Lapides talks about a

16    state waiving its Eleventh Amendment immunity by seeking a

17    federal forum, Specifically in the context of a removal in

18    that case.  But it -- there is an argument to be made, and

19    we can certainly at the merits of this case address it as to

20    whether by bringing this appeal they've waived their

21    sovereign immunity.

22         Now that also gets to the question here, Your Honor,

23    none of the these entities are actually the tribe itself.

24    Now the plaintiffs have argued that they are arms of the

25    tribe, and they're correct that there are situations where

26    non-tribal -- non-governmental tribal entities can become

27    arms of the tribe.

greatplainsv.deptbanking2.13.15.txt

1          Now, Your Honor is probably familiar with

2     "arm-of-the-state" analysis for state sovereign immunity

3     purposes, and one of the factors for that analysis is

4     whether any financial recovery from the entity would go

5     against the tribe or the state in this "arm-of-the-state"

6     situation.

7          Now if I could point Your Honor to the plaintiffs'

8     papers, it's Exhibit C on page 29 of Exhibit C.  This is a

9     citation -- this is tribal law on LLCs and specifically

10    tribally owned LLCs.  If I could point Your Honor to page 29

11    of that exhibit, paragraph 1(b).  That specifically provides

12    that any recovery against the Tribally owned LLC will not

13    inure against the tribe itself.

14         So if the plaintiff -- so that would go against that

15    aspect of the arm of the tribe analysis, and this is a

16    situation that -- at least in the "arm-of-the-state"

17    context, that -- the second circuit has concluded that that

18    is the most relevant factor is whether any financial

19    recovery would go against the state.

20         Now, again, the plaintiffs, I'm sure, will have

21    arguments for why that wouldn't control here, but that is

22    certainly -- really, at this stage, when we're trying to

23    determine whether there's grounds for litigation, and we

24    believe there is.

25         Now to get to -- in addition, in the tribal law, LLC

26    law it provides both that LLCs on page 14 of the same

27    exhibit I was referencing, that LLCs cannot engage in a

greatplainsv.deptbanking2.13.15.txt

```
 1      violation of criminal law.  Now a violation of Connecticut's
 2      usury statute is a violation of Connecticut criminal law.
 3      Now I'm sure that they'll have arguments that a violation of
 4      Connecticut criminal law is not a violation of criminal law
 5      for purposes of tribal law, but that's an issue that could,
 6      that would need to be developed.
 7              Now they -- they talk about the Supreme Court's case in
 8      Kiowa, which is true, concluded that tribal sovereign
 9      immunity can bar suit based on off-reservation conduct.  Now
10      Kiowa did not involve a situation where the off-reservation
11      conduct was in cyberspace or where it occurred 1,400 miles
12      from the Tribe's reservation.  Nor did it involve a claim
13      for injunctive or declaratory relief.
14              So the Department has two aspects of its order:  It has
15      a cease and desist order, as case for declaratory injunctive
16      relief and it has monetary aspects.  Kiowa did not say that
17      tribal sovereign immunity would bar a declaratory injunctive
18      plan, and that's analogous to the state sovereign immunity
19      situation where declaratory injunctive relief is more
20      available.  And I can cite Your Honor to a case TTEA v.
21      Ysleta Del Sur Pueblo, which 181 f.3d 676.  It's a fifth
22      circuit case from 1999 that discusses Kiowa specifically in
23      this aspect and cites supreme court authority for the
24      propositions.
25              THE COURT:  With regard to financial order -- again,
26      it's not the main focus here.  But, I think originally the
27      commissioner had ordered restitution that doesn't appear in
```

Page 22

greatplainsv.deptbanking2.13.15.txt

1    the final order, is that now withdrawn?

2         ATTY. DEICHERT:  I would say we are -- whatever the

3    commissioner ordered in the final order would be kind of the

4    applicable order.

5         THE COURT:  Okay.  All right.

6         ATTY. DEICHERT:  And so --

7         THE COURT:  And there does not appear to be a

8    restitution component to it.  Just civil penalties and

9    injunctive relief.

10        ATTY. DEICHERT:  Yep.  That's my understanding.  Oh, it

11   did.  I'm sorry, Your Honor.  If I may just confer?

12        THE COURT:  Go ahead.

13        (Off record between counsel).

14        ATTY. DEICHERT:  Okay.  Your Honor, my client is

15   correcting my misstatement.

16        The restitution aspect did become operative by

17   operation of law because it appeared in the "whereas" clause

18   of the final order.

19        THE COURT:  Oh.

20        ATTY. DEICHERT:  So I apologize for misspeaking.  Now

21   on the applicable law, again, to go back to the second

22   circuit's decision in Otoe, the court noted that the second

23   tribe was going, going to be able to avoid state regulation

24   on online lending, it would need to show very specific

25   facts.

26        Now we're dealing with an administrative appeal, where

27   they defaulted and declined to challenge the facts below.

Page 23

greatplainsv.deptbanking2.13.15.txt

24

1      And so that goes to the likelihood of success as well.

2           THE COURT:  Okay.

3           ATTY. DEICHERT:  Now, and so I believe as to the issue

4      of reparable harm to the Tribe, Your Honor, I would agree

5      that the harm at issue here is -- I mean, ultimately, this

6      is balancing of the equities.  To the extent the harm -- the

7      Tribe has harm and we're not in any way denying them their

8      sovereignty.  Really the question is:  what's the scope of

9      the sovereignty, and what's the more immediate harm?  Is it

10     to the Connecticut citizens and residents who are being

11     charged these rates that, as you noted, flagrantly violate

12     Connecticut Law; or is it the general harm to the Tribe's

13     conception of sovereignty?  And the question really is:

14     like, is there a limit to the Tribe's sovereignty?  I mean

15     certainly the state's sovereignty has limits.  Pretty much

16     any sovereign's sovereignty has limits.  And really the

17     question before the Court is:  what are the limits of that?

18          The question for the Court today is whether we want to,

19     while we're litigating those limits, do we want to leave

20     Connecticut consumers unprotected?  And we respectfully

21     submit that the Court shouldn't.  And I'm happy to present

22     evidence on the public interest, if you'd like.

23          THE COURT:  Well, I don't think it's necessary, but I

24     think you said in your brief that the Tribe, even if it's

25     enjoined from -- excuse us.

26          (Interruption).

27          THE COURT:  Even if the Tribe is enjoined from doing

greatplainsv.deptbanking2.13.15.txt

1      this in Connecticut is free to do it in 49 other states.  Do

2      we know if that's the case?  Do we know if they are, they do

3      practice in some states?

4           ATTY. DEICHERT:  I actually do not know.  I mean I

5      think it appears that they do, but they would be better able

6      to answer that question, Your Honor.

7           We have limited information about kind of the scope of

8      the Tribe's business in Connecticut.  We did have these

9      complaints that brought this administrative action and we're

10     sure there is others; but we do not really have much of an

11     idea of how much business the Tribe does in the state of

12     Connecticut, which goes to whether they've met their burden

13     on showing a harm where we're not even -- it could just be

14     these three people.  We don't really know.

15          THE COURT:  What's the three people?

16          ATTY. DEICHERT:  The three people that, that were

17     involved in the administrative -- that, whose loans were at

18     issue in the administrative hearing.

19          We would imagine that that's not the only customers

20     they have in Connecticut, but we, at this point I will

21     check, but I don't think we -- I don't believe that we have

22     other evidence at this point to, to go to the scope of

23     Tribal business in Connecticut.

24          THE COURT:  Let me ask you this question which is a

25     slightly different topic, but on the issue of filing suit

26     against an indian tribe.

27          ATTY. DEICHERT:  Yep.

greatplainsv.deptbanking2.13.15.txt

1          THE COURT:  You claim that an administrative action is

2     not such a suit.  Even if that's the case, how would you

3     enforce an administrative order without filing suit?

4          ATTY. DEICHERT:  That's, that's a very good question,

5     Your Honor.  I mean I -- my understanding is -- I mean it's

6     going to depend on the type of the kind of relief we were

7     looking at.  I mean, ordinarily, in order for us to enforce

8     a money judgment, we would be required to, to go to court

9     and obtain a judgment, an actual court judgment allowing for

10    the award of money.

11         As to the injunctive relief, I would imagine probably

12    the same.  Now that goes back to the question of what

13    consequence is it that we are now in court, and that's going

14    to be something that, you know, we're -- obviously, we know

15    that the plaintiffs have said that -- they were preserving

16    their sovereign immunity, you know, notwithstanding having

17    filed this action.  And really the question, one of the

18    questions, one of the many questions in this case is going

19    to be:  Can they do that?

20         You know, now a state -- to the extent the state is

21    analogous, state sovereign immunity is, in other states,

22    under Nevada v. Hall, is not required to be recognized.

23    States can choose to recognize it or not choose to recognize

24    it as a matter of comedy.  But I mean, and tribal sovereign

25    immunity, I think a lot of issues with sovereign, you know,

26    are still being kind of worked out through the process,

27    through the courts.

Page 26

greatplainsv.deptbanking2.13.15.txt

1          THE COURT:  What sort of, given my statement, perhaps

2     even your position, that the plaintiffs are not going to be

3     required to pay anything to the defendants by February 6, is

4     there a likelihood of agreements with the plaintiffs as to

5     how they can insure payment of any judgment?

6          ATTY. DEICHERT:  I believe that we would be more than

7     willing to, to discuss that with the plaintiffs and --

8          THE COURT:  Okay.

9          ATTY. DEICHERT:  -- then determine an acceptable means

10    of assuring that.

11         THE COURT:  Okay.

12         ATTY. DEICHERT:  And if I may just to the sovereign

13    immunity argument --

14         THE COURT:  Yes, sir.

15         ATTY. DEICHERT: -- Your Honor, before I forget.

16         THE COURT:  Yes.

17         ATTY. DEICHERT:  There's two different types of claims

18    in this case.  We have claims against the entities and we

19    have claims against the individual.

20         THE COURT:  True.

21         ATTY. DEICHERT:  Now the plaintiffs have focused a

22    great deal on the monetary claims against the individual.

23    We also have cease and desist declaratory injunctive claims

24    against the individual.

25         Now sovereign immunity just like, as with the state,

26    sovereign immunity generally not bar a declaratory

27    injunctive claim against an individual.  And so that's

Page 27

greatplainsv.deptbanking2.13.15.txt

28

```
 1        another question that we would need to address.  And so
 2        really for today we're not asking the Court to resolve these
 3        issues.  There are many and complicated and difficult ones.
 4        Really what we're asking is just allow us to protect
 5        Connecticut consumers to the extent we can while we figure
 6        these issues out and litigate them forward.
 7            THE COURT:  Is that part of the responsibility of the
 8        Department of Banking:  Protection of consumers?
 9            ATTY. DEICHERT:  Well, certainly the responsibility is
10        to enforce Connecticut's banking laws and those laws are
11        intended to protect consumers specifically against usurious
12        interest rates; and so, yes, I would say it is.
13            THE COURT:  Okay.  All right.  What else would you like
14        to add?
15            ATTY. DEICHERT:  I believe that's all, Your Honor.
16            THE COURT:  Okay.  Thank you, sir.
17            ATTY. DEICHERT:  Thank you.
18            THE COURT:  Your response, Mr. Rosette?
19            ATTY. ROSETTE:  Thank you, Your Honor.  With regard to
20        the New York case again, that entire case does not go to the
21        issues of sovereign immunity.  And in this specific case,
22        our, our filings are not some sort of unwitting grant of
23        jurisdiction to this court.  We filed only to contest
24        jurisdiction of this court.  Oh, I'm sorry.  To contest
25        jurisdiction of the Department and the decisions that they
26        made against the Tribe and no other purpose.  It's a very --
27            THE COURT:  Well, at the administrative level?
```

Page 28

greatplainsv.deptbanking2.13.15.txt

1          ATTY. ROSETTE:  At the administrative level.

2          THE COURT:  Right.  Right.

3          ATTY. ROSETTE:  And --

4          THE COURT:  But why isn't your filing of a suit here in

5     superior court a waiver of tribal sovereign immunity?

6          ATTY. ROSETTE:  Because, Your Honor, we had a February

7     6th deadline that we needed to understand that there would

8     be a stay of, of any sort of attempt to, to collect on, on

9     an assessment that is not valid.  And so we're seeking that

10    from this court, and obviously we will address the sovereign

11    immunity arguments, you know, as, as this case proceeds.

12         THE COURT:  But, but it seems that you had a choice,

13    just like you say the consumer had a choice as to whether or

14    not to accept these loans.  You had a choice, and you could

15    have decided not to file an action in superior court and

16    instead just let the Department of Banking orders stand

17    knowing that if they had filed an action in superior court

18    to attempt to enforce, then you would have a stronger

19    sovereign immunity argument.  But instead you filed your own

20    suit in sovereign immunity, why shouldn't you be held to the

21    consequences of your own choice?

22         ATTY. ROSETTE:  Your Honor, we, we cite to

23    well-established precedent in our brief that a sovereign

24    tribe's limited appearance in legal proceedings for the

25    purpose of seeking dismissal of an administrative action or

26    any sort of dismissal for lack of jurisdiction does not

27    waive any claims whatsoever to sovereign immunity.

greatplainsv.deptbanking2.13.15.txt

1     Kansas v. United States we cite, which is a tenth

2     circuit case. We've got, we've got several other cases in a

3     footnote that, that demonstrates the authority that, that --

4     this is our plaintiffs' application for a temporary

5     injunction to begin with. But we, we are not unwittingly

6     stepping into any issues except for what we have a very

7     clear understanding of what we can do.

8          With regard to the arm of the tribe analysis, Your

9     Honor, as you what might gather, state law and tribal law

10    are completely a different analysis with regard to this

11    issue. The arm of the tribe analysis has been litigated and

12    decided upon by several courts at the federal and state

13    level. It's very clear there is a specific test that we

14    laid out in our, in our pleadings to you in our application

15    for temporary injunctive. That test is whether or not the

16    entity was created by tribal law, whether the tribe owns and

17    controls the entity, the purpose of the tribal entity and

18    whether the entity's economic benefits the tribe, whether or

19    not their development arms are benefiting the tribe, and

20    whether or not the tribe intended for this entity to have

21    that arm of the tribe status. That test has been -- the

22    case has been litigated over and over again, and the law has

23    been very clear. Again, all on the basis of these tribal

24    sovereign-type precedent that has been set.

25         To the point that, regarding injunctive relief not

26    rising to the level of sort of the sovereign immunity-type

27    waivers.

Page 30

greatplainsv.deptbanking2.13.15.txt

1           THE COURT:  Right.

2           ATTY. ROSETTE:  I just point out that in the Bay Mills

3    case, the state of Michigan sought injunctive relieve in

4    that case, and the sovereign immunity of the tribe was

5    upheld.  So you can look to the supreme court's recent 2014

6    decision with regard to that.

7           And then with regard to whether or not, you know, this

8    rises -- the Department of Banking's action rises to the

9    level of a suit, the Banking Department obviously follows

10   the Connecticut code in this matter which identifies the

11   action they took as a contested case in the law itself.

12   There is a decision-maker, there is briefing.  There's no

13   doubt that that was an adversarial action.  And really

14   sovereign immunity from suit means that we're not, that the

15   Tribe is not subject to legal proceedings where those two

16   factors come into play, whether the Tribe consented to that

17   jurisdiction or whether congress abrogated it.  And the

18   very, as you probably know, the very basis of sovereign

19   immunity which comes all the way from England, is that, you

20   know, that governments should not have their treasuries

21   depleted through various actions that come against them.  So

22   it's a time old notion of the law.

23          The Colorado case, and we also cited to some Minnesota

24   administrative proceedings in our action, noted that those

25   state enforcement actions were equivalent to suit.  So we

26   ask you to seek guidance particularly from the Colorado

27   Supreme Court case.

                        Page 31

greatplainsv.deptbanking2.13.15.txt

32

1        One other point that I just make is, is they

2     demonstrated the only record in this case is that there

3     actually is no evidence that no more than three people have

4     alleged harm or that this exists, and we ask you to

5     recognize that the Tribe in this case, this is a government.

6     There is a real impact to their sovereignty, to the chairman

7     of this Tribe to follow his constitution, to carry out his

8     legal duties to his Nation, and there are government

9     programs that are at stake here with regard to the harm that

10    can be caused if the stay is not put into place.

11        THE COURT:  Some of that I might be able to get from

12    the affidavit or affidavits that you've attached.  But I

13    think some of the same issues are going to arise on the

14    merits as to whether this goes to the essentials of tribal

15    self-government as to whether you should be able to assert

16    sovereign immunity.  But the record is not going to contain

17    that information because you didn't appear at the

18    administrative hearing.

19        So how, how are you going to prevail on the merits of

20    the administrative appeal and establishing sovereign

21    immunity when many of these facts are not in the record?

22        ATTY. ROSETTE:  Because, Your Honor, in the, in the

23    Department of Banking proceedings, we did establish an

24    administrative record with regard to the Tribe's laws, the

25    formation of the companies and the regulations and so on and

26    so forth.

27        THE COURT:  Well, was that part of your motion to

Page 32

greatplainsv.deptbanking2.13.15.txt

1      dismiss?

2            ATTY. ROSETTE:  Correct.

3            THE COURT:  All right.  Further comments?

4            ATTY. ROSETTE:  No, Your Honor.  Thank you.

5            THE COURT:  All right.  Let me just clarify that,

6      again, I'm not going to order the plaintiffs in any way to

7      make any payments to the state by February 6th or at any

8      point until the appeal is resolved.  So would it be

9      sufficient if I just say in my order, which I will put in

10     writing, that the -- that the parties will work out the

11     remaining details.  I'll say that, and if there are problems

12     then you can let us know.  But from the responses, I'm

13     confident that the parties can agree on, on basically a

14     means of satisfying a judgment if there is a final judgment

15     against the plaintiffs, and then I'll address the injunctive

16     relief in my order.

17           I know you had some questions about scheduling.  The

18     state has filed a motion to dismiss; ordinarily, you have 30

19     days to respond and then we usually set it down for a

20     hearing three weeks thereafter.  If the date is

21     inconvenient, because I know you're coming from Washington

22     D.C., let us know and we'll find a convenient time.

23           ATTY. ROSETTE:  Thank you.

24           THE COURT:  And then we'll try to move along the

25     merits.  It's probably -- well, as quickly as possible.

26     Okay?  All right.  Thank you very much.  We'll stand

27     adjourned.

greatplainsv.deptbanking2.13.15.txt

34

```
 1   No:  HHBCV15-6028096 S        :    SUPERIOR COURT

 2   GREAT PLAINS LENDING, LLC,    :    JUDICIAL DISTRICT
     Et al.                             OF NEW BRITAIN
 3

 4   v.                            :    AT NEW BRITAIN, CONNECTICUT

 5   STATE OF CONNECTICUT          :    February 4, 2015
     DEPARTMENT OF BANKING, et al
 6   _____:

 7

 8               C E R T I F I C A T E

 9        I hereby certify that the foregoing pages are a true and

10   correct transcription of the audio recording of the

11   above-referenced case, heard in Superior Court, Judicial

12   District of New Britain, New Britain, Connecticut, before the

13   Honorable Carl J. Schuman, Judge, on the 4th day of February,

14   2015.

15

16        Dated this 18th day of February, 2015, in New Britain,

17   Connecticut.

18

19

20

21

22

23   _____
     Donna L. Peluso,
24   Court Recording Monitor

25

26

27
```

Page 34